IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **MATTHEW THOMAS REID**, Claimant, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 14 C 6985 |
| ) | |
| **CAROLYN W. COLVIN**, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Matthew Reid ("Reid") seeks judicial review pursuant to the Social Security Act ("Act"), more specifically 42 U.S.C. § 405(g),[1] of the final decision by Acting Commissioner of Social Security Carolyn Colvin ("Commissioner") that denied Reid's claims for disability insurance benefits ("SSDI claim") and supplemental security income ("SSI claim") under Titles II and XVI of the Act, respectively. Reid and Commissioner have filed cross-motions for summary judgment under Fed. R. Civ. P. ("Rule") 56, and Reid has alternatively sought remand for further proceedings.[2] For the reasons stated here, both Rule 56 motions are denied but Reid's alternative request for a remand is granted.

---

[1] All further statutory references will take the form "Section --," using the Title 42 numbering rather than the Act's internal numbering. All portions of 20 C.F.R. will be cited "Reg. § --." Citations to the record are denoted "R. --." Finally, citations to Reid's motion, memorandum and reply take the form "R. Mot.," "R. Mem." and "R. R. Mem." respectively.

[2] Although Reid's motion simply states that he is moving for summary judgment, his memoranda in support alternatively ask for a remand (compare R. Mot. 1 with R. Mem. 14 and R. R. Mem. 4).

## Procedural Background

Reid filed an application for both Title II and Title XVI benefits on June 23, 2011, alleging a disability onset date of October 10, 2003 due to (1) a brachial plexus lesion, (2) an L5 disc rupture, (3) cervical spinal pain and (4) depression (R. 92-95, 100, 105). That application was denied initially on November 21, 2011 and then again on reconsideration on May 14, 2012 (R. 96, 101, 114-118).

Reid then made a timely filing for a hearing, which Administrative Law Judge ("ALJ") Patricia Witkowski Supergan conducted on February 1, 2013 (R. 43), with testimony taken from Reid, a clinical psychologist and a vocational expert (R. 43). On March 27, 2013 the ALJ issued a decision denying Reid's application (R. 14-35). Reid then requested review from the Appeals Council, which denied that request on July 11, 2014 (R. 1), so that the ALJ's opinion represents Commissioner's final decision. This action was timely filed on September 9, 2014.

## Background and Medical Evidence

Reid suffers from injuries he received in two incidents -- one in 2003 and one in 2007 -- and from depression. Because depression is a condition that is not describable in terms of a discrete event, the ensuing narrative first focuses on the two physical incidents and then turns to Reid's depression.

In 2003 Reid injured his back while working on the job for a brick manufacturer -- he felt a "severe pain" in his lower back and suddenly lost control of his legs (R. 46, 49). He has not returned to work since that injury (R. 46). In 2007 Reid got into a single car rollover accident and sustained another series of injuries (R. 251), including fractures to his cervical spine (R. 333) and a neural injury to his brachial plexus, which dramatically impaired his left arm function (R. 279). According to the Mayo Clinic "[t]he brachial plexus is the network of nerves that

sends signals from your spine to your shoulder, arm and hand" (Brachial Plexus Injury, Mayo Clinic (Mar. 17, 2015), http://www.mayoclinic.org/diseases-conditions/brachial-plexus-injury/home/ovc-20127336). This opinion will detail the evidence as to Reid's back problems and left arm impairment, for both are central to the issues in this appeal.

**Reid's Back Injury**

Reid has degenerative disc disease and, following his accident in 2003, suffered injury to his spinal disc between the L5 and S1 vertebrae (R. 526, 539). Following the 2003 accident Reid initially had an L5/S1 "disc protrusion" that later developed into a central disc herniation (R. 539).[3] On initial examination in 2003, treating physician Dr. Charles Slack determined that Reid's back problems were sufficiently severe that he was temporarily totally disabled from regular work duty, because no lighter duty was available to him (R. 528). At the same time Dr. Slack concluded that Reid was not a surgical candidate -- he then expected that Reid would respond to conservative treatment (R. 531).

Reid's back problems continued to progress, however. In early 2004 Dr. Slack noted that Reid had a fully herniated disc and that he experienced increased pain whenever he sat or stood for any length of time (R. 539). Dr. Slack determined that Reid was temporarily totally disabled, this time without any caveat as to the availability of light work in Reid's workplace, and he suggested that Reid undergo epidural steroid injections to relieve the pain (id.). Some months later Dr. Slack also diagnosed Reid with lumbar spinal stenosis: "a narrowing of the open spaces within [one's] spine, which can put pressure on [one's] spinal cord and the nerves that travel

---

[3] According to the Mayo Clinic a herniated disc occurs when the tough exterior of the disc cracks and the jelly-like center of the disc pushes through (Herniated Disk, Mayo Clinic (Jan. 28, 2014), http://www.mayoclinic.org/diseases-conditions/herniated-disk/basics/definition/con-20029957).

through the spine." (R. 622; Spinal Stenosis, Mayo Clinic (June 12, 2015), http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105).

Pursuant to doctor's orders Reid underwent two lumbar epidural steroid injections that relieved his symptoms temporarily (R. 540, 545). Following that treatment in October 2004, Reid underwent a functional capacity evaluation in which doctors determined that he could undertake a medium level of work (R. 541, 543).

Reid began taking courses and even riding his bike (R. 549, 553), but he continued to have flareups in his symptoms (R. 549). Then in July 2006 Dr. Slack found Reid qualified for part-time work for four hours a day, but with no prolonged standing, sitting or walking (R. 555). At that time Dr. Slack noted that Reid had "ongoing persistent pain" that occasionally "radiated into the sides of his lower back" and that he experienced a "deep pressure sensation . . . with any activity such as bending, standing up straight," while Reid himself reported that even doing his laundry caused an increase in symptoms (R. 556). In February 2007 Reid experienced an acute flareup in pain while carrying a backpack that caused him to fall (R. 560). One year later (in February 2008) Dr. Slack wrote that Reid was temporarily totally disabled until his pain would become better controlled (R. 562-63).

Dr. Slack's next treatment note is from February 2010, when he concluded that Reid was disabled from work for at least the next 12 months (R. 565, 412). Reid's own 2012 report notes that his back pain makes it tough to sit or stand for any period of time (R. 230). Although Reid's visits with Dr. Slack were certainly sporadic, Reid testified that his financial circumstances prohibit him from being able to afford doctor's appointments and medical treatments (R. 224).

**Injury to Reid's Left Arm**

Reid's other major physical ailment is the partial paralysis of his left arm, which occurred as a result of his 2007 car accident. Following that accident his left arm was entirely flaccid (R. 539), though over time he regained some control of it. In June 2011 Reid was able to fire his bicep[4] and flex his elbow, though he still had no hand or wrist or finger function (R. 431) and, according to Reid's own function report, he had no feeling in his left hand (R. 23). Doctors recommended on different occasions that Reid undergo nerve grafting surgery, but Reid opted not to undergo the surgeries they recommended (R. 51-52): According to Reid's deposition testimony, the surgeries were experimental and unlikely to improve his condition significantly (R. 51-52).

**Reid's Depression**

Reid's depression is also well-established in the latter part of the record. Dr. Mark Langgut's October 2011 consultative psychological examination marks the earliest discussion of that condition in the record (R. 448). In that examination Dr. Langgut diagnosed Reid with depressive disorder not otherwise specified and noted to be untreated, with polysubstance abuse in remission and with a personality disorder with narcissistic features (R. 451). Between December 2012 and January 2013 Reid sought treatment at the Institute for Personal Development for severe major depressive disorder (R. 581). There the psychiatric mental health practitioner determined that Reid is "significantly impaired" by severe depression, that it has existed "for many years" and that Reid is likely to be "refractory to treatment" (id.).

---

[4] That usage, totally unfamiliar to this Court, does not appear to fit precisely within the numerous meanings listed for the transitive verb "fire" in "Webster's Third New International Dictionary. It is repeated here because the ALJ included it within her specific findings, based on the Mayo Clinic's Brachial Plexus - Orthopedic report.

In Reid's Psychiatric Review Technique the Social Security Administration's psychiatric consultant confirmed Dr. Langgut's diagnoses (R. 453). She also determined that Reid had moderate difficulties in maintaining social functioning and mild difficulties in completing his activities of daily living, as well as mild difficulty in maintaining concentration, persistence and pace (R. 463).

### **Hearing Testimony**

At the ALJ's hearing Reid testified that the severity of his back pain comes and goes -- on some days the pain is so bad that he cannot do anything (R. 58). He also cannot sit long without his back starting to hurt, so he needs to alternate sitting and standing (R. 57). As to his left arm problem, Reid testified that he can barely do anything with his left hand or arm: While he can bend the arm, he cannot grasp with his hand or lift his wrist (R. 51). Reid continues to suffer constant pain from the nerve damage, as well as numbness and tingling stretching from his shoulder to his fingertips (R. 60-61).

As to Reid's depression the psychological expert confirmed that the overall record supports a diagnosis of depression, though it has gone untreated (R. 74). Reid testified that he has been hesitant to take medication for his depression because he is averse to drug treatment -- he said that he had been researching to find medication that he feels "is safe" but has found that some of the medications recommended to him "seriously alter chemicals in your brain" (R. 66). Reid also expressed concern about beginning a medication "and then having it taken away and having to deal with the withdrawals. I don't really have a way to pay for that medication continually throughout the rest of my life" (id.).

To determine whether there were sufficient jobs for Reid in light of his physical and mental abilities, the ALJ posed a series of hypotheticals to vocational expert Natalie Maurin (the

"VE"). First she asked the VE about the availability of work for someone who could perform light work with limitations -- most important among them are the ability to balance, stoop, kneel and crawl only occasionally and the ability to use the left upper extremity only as a guide (R. 83). According to the VE such an individual could find sufficient work -- as a mail clerk, a labeler or an office helper (id.) -- and if that hypothetical were further limited to only occasional conduct with the general public, there would still be work for such an individual as a mail clerk, a labeler or a laundry sorter (R. 83-84). To pursue the issue somewhat more, any individual who was even further limited to jobs involving only occasional decisionmaking and no fast-paced work could still find jobs as a mail sorter, a laundry sorter or a housekeeper (R. 85). Lastly, as to someone with absolutely no use of the upper left extremity (but with no other limitation on pace), there would be jobs in the national economy as a mail clerk or a labeler (R. 85-86). With respect to all of those opportunities, an individual could be off-task no more than 15% of the workday and absent no more than 10 to 14 days per year (R. 88).

## **ALJ's Decision**

Although the ALJ's discussion of her findings occupies twenty-two pages (R. 14–35), this summary provides an ample basis for evaluation in this opinion:

1. Reid met the insured status requirements of the Act through September 30, 2007 (R. 16).

2. Reid had not engaged in any substantial gainful activity since October 10, 2003, the alleged disability onset date (id.).

3. Reid suffered from severe impairments comprising a brachial plexus injury to his left upper extremity and depression (id.).

4.  Reid's impairments did not meet or medically equal the severity of any of several listed impairments: 1.02 ("Major dysfunction of a joint(s)"), 12.04 ("Affective Disorders"), 12.08 ("Personality Disorders") and 12.09 ("Substance Addiction Disorders") (R. 16-18).

5.  Reid had the residual functional capacity ("RFC") to perform light work with limitations, including among other things (a) that he can balance, stoop, kneel, crouch and crawl only occasionally, (b) that he can use his upper left extremity only as a guide and to support lifting with the upper right extremity, (c) that he can perform only unskilled work tasks and (d) that he may have only occasional interaction with supervisors and coworkers (R. 18).

6.  Reid is unable to perform any past relevant work (R. 33).

7.  Because he was 27 years old as of the alleged onset date of the injury, Reid is classified as a "younger individual" (the span for that classification runs from age 18 to age 49) (id.).

8.  Reid has at least a high school education and can communicate in English (id.).

9.  Transferability of job skills is not material to the disability determination because Reid's past relevant work is unskilled (id.).

10. Reid has the RFC to perform certain jobs that "exist in significant numbers in the national economy" (R. 34).

11. Reid has not been under a "disability" as defined in the Act from October 10, 2003 through the date of the ALJ's decision (March 27, 2013) (id.).

It is against that backdrop that this Court must perform its task.

**Standard of Review and Applicable Law**

This Court reviews the ALJ's decision as Commissioner's final decision, reviewing the legal conclusions de novo and factual determinations with deference (Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir.2005)). Because factual determinations receive deferential review, courts "are not to reweigh the evidence or substitute [their] own judgment for that of the ALJ" and are to affirm Commissioner's decision "if it is supported by substantial evidence" (id.). But as Haynes, id. further explains, "the ALJ must build a logical bridge from the evidence to his conclusion." Hence "[i]f the Commissioner's decision lacks adequate discussion of the issues, it will be remanded" (Villano v. Astrue, 556 F.3d 558, 562 (7th Cir.2009)).

Credibility determinations receive an even more deferential review. Courts can reverse or vacate an ALJ's credibility findings only when the findings are "patently wrong" (Elder v. Astrue, 529 F.3d 408, 413–14 (7th Cir.2008)). Still, ALJs commit reversible error when they ground their credibility determinations "on errors of fact or logic" (Allord v. Barnhart, 455 F.3d 818, 821 (7th Cir.2006)).

To qualify for benefits a claimant must be "disabled" within the meaning of the Act (Liskowitz v. Astrue, 559 F.3d 736, 739 (7th Cir.2009), citing Section 423(a)(1)(E)).[5]

---

[5] Section 423 governs SSDI claims, while Section 1382 governs SSI claims. Typically the two statutes use identical language, with some minor variations in wording that do not reflect substantive legal differences. For the sake of brevity this opinion will cite only Section 423,

(continued)

"Disability" is defined in Section 423(d)(1)(A) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." For the determination of whether a claimant is disabled, Knight v. Chater, 55 F.3d 309, 313 (7th Cir.1995) sets out the customary five-step inquiry prescribed by Reg. § 404.1520(a)(4)5[6]:

(1) whether the claimant is currently employed;
(2) whether the claimant has a severe impairment;
(3) whether the claimant's impairment meets or equals one of the impairments listed by the [Act], see Reg. § 404, Subpt. P, App. 1;
(4) whether the claimant can perform [his] past work; and
(5) whether the claimant is capable of performing work in the national economy.

To receive disability benefits an applicant for SSDI must also meet the insured status requirements outlined in Section 416(i)(3). That means that (for his disability insurance claim only) Reid must show he was under a disability after his alleged disability onset date of October 10, 2003 (R. 100) but before his insured status expired on September 30, 2007 (Reg. § 404.131(a); Martinez v. Astrue, 630 F.3d 693, 699 (7th Cir.2011)). For Reid's SSI application he can establish disability at any time between his application date of June 23, 2011 and the present (see Regs. §§ 416.200 and 416.202(g)).

---

(footnote continued)
except of course in instances where it materially diverges from Section 1382 (or from related Sections 1382a, 1382b, 1382c et al.).

[6] Reg. § 404 governs social security disability benefits, while Reg. § 416 governs supplemental security income. As with the statutory provisions, this opinion will cite only Reg. § 404 except where the regulations diverge materially.

### Flaws in the ALJ's Opinion

According to Reid the ALJ erred both in assessing his RFC and in examining whether he met the listing requirements. This opinion addresses both contentions and concludes that a remand is called for.

**Erroneous RFC Assessment**

As for Reid's residual functional capacity, the ALJ concluded that he could perform light work with limitations, most importantly that he could use his left arm as a guide for his right, and that he could occasionally stoop and crouch. That analysis was flawed on several grounds, including (1) that there is no basis in the record for the conclusion that Reid could use his left arm as a guide, (2) that the ALJ failed to give due consideration to treating physician Dr. Slack's extensive notes as to Reid's back and (3) that the ALJ discredited Reid's allegations of pain without considering the ample medical evidence in the record that could support them.

There are several broad categories of RFC -- sedentary, light, medium and heavy work (see SSR 96-8P). Light work is defined as (Reg. § 404.1567):

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Thus the full range of light work entails standing or walking for significant periods of time -- approximately 6 hours out of 8 (SSR 83-10) -- plus not insignificant physical labor. Importantly, the fact that an individual can perform a limited range of light work does not necessarily imply that he or she can also perform do a full range of sedentary work -- especially where, as here,

there is record evidence that Reid lost considerable dexterity in his left hand and has difficulty sitting for long periods of time. So if Reid cannot perform even light work he may be completely disabled.

RFC determinations require the ALJ to consider (1) all relevant lines of evidence, both medical and nonmedical (Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001), citing Reg. § 404.1545(a)(1)), and (2) all of an individual's impairments -- even those that are not "severe" on their own (Reg. § 404.1545(a)(2)). Additionally, an ALJ has an obligation to consider all relevant lines of evidence and to reconcile any material inconsistencies, for it is improper to "select and discuss only that evidence that favors [her] ultimate conclusion" (Herron v. Shalala, 19 F.3d 329, 333 (7th Cir.1994); SSR 96-8p).

In arriving at her RFC assessment the ALJ included her ipse dixit that -- without providing any real explanation why -- Reid would be able to use his left arm as a "guide" for work done with his right. Nothing in the record reveals how the ALJ arrived at that conclusion -- and to the contrary, she failed to reconcile that conclusion with the wealth of evidence indicating a complete lack of left hand function, coupled with significantly impaired ability in the rest of the left arm. Indeed, Reid testified that he can't do "really anything" with his left arm or hand (R. 51). Yet no mention was made of that evidence in the ALJ's opinion.

Nor did the ALJ give due weight to Dr. Slack's records as to Reid's back impairment. Instead she wholly ignored his opinions -- with the exception of one that she cherry-picked out of the record from 2004 -- on the grounds that those opinions were merely provided "by checking boxes on a standardized form," gave no "function by function analysis" and were "not supported by Dr. Slack's own objective clinical or laboratory findings" (R. 32). Contrary to those dismissive characterizations of Dr. Slack's opinions, each of his check-the-box forms is

supported by a lengthier descriptive memorandum elaborating on Dr. Slack's findings, and those notes provide support for Dr. Slack's conclusions.

To the extent that Dr. Slack's medical findings were well-supported and consistent with substantial evidence in the record, such cases as <u>Elder</u>, 529 F.3d at 415 (and see also Reg. § 404.1527(c)(2)) teach that those findings were entitled to controlling weight because of his role as Reid's treating physician. But even if that controlling-weight status were not called for, the ALJ still had an obligation to determine <u>how</u> <u>much</u> weight to afford them based upon her consideration of a number of factors, such as the length, nature and extent of the treating relationship (<u>Elder</u>, 529 F.3d at 415; Reg. § 404.1527(c)(2)(i)-(ii)). But the ALJ did not explain how she weighed these factors (or even if she did).

Obviously the ultimate conclusion as to whether Reid was completely disabled from full-time work lies in the province of the SSA and not Dr. Slack, so that his opinion on that ultimate issue is not entitled to <u>controlling</u> weight. But cases such as <u>Barnett v. Barnhart</u>, 381 F.3d 664, 669 (7th Cir. 2004) have held that a treating physician's statements on that score are nonetheless entitled to consideration -- in fact, they <u>must</u> be considered -- and that an ALJ has the obligation to seek clarification of those statements where necessary. Here the ALJ did not discuss those opinions or seek their clarification despite her obligation to do so.

Finally, the ALJ also erred in assessing Reid's credibility. She gave little weight to Reid's complaints about his pain and other symptoms on six flawed grounds: (1) his history of sporadic treatment and release in 2004 to perform medium work, (2) his lack of compliance with prescribed treatment and medication, (3) his failure to seek mental health treatment until 2012, (4) the fact that his back condition improved in 2004 after he received steroid injections, (5) the fact that an MRI in 2003 suggested only minimal findings regarding his back and indicated that

he could be treated very conservatively and (6) Reid's contradiction of his own statements about alcohol and drug abuse (see R. 31-32).

Ordinarily District Judges cabin their review of credibility determinations substantially -- they "merely examine whether the ALJ's determination was reasoned and supported" (Elder, 529 F.3d at 413) -- but as already noted, an ALJ's credibility determination can be overridden if she commits an error of fact or logic (Allord, 455 F.3d at 821). Here analysis discloses several such errors.

To begin with, Reid's history of sporadic treatment and his lack of compliance with prescribed treatment (the ALJ's first three reasons for discrediting Reid) can be explained by two things, both well-documented in the record: (1) Reid's lack of financial means and (2) his fears about the side effects of different treatments and his concern about becoming dependent on certain medications for his depression, which he might not always be able to afford.[7] And as for the minimal findings from 2003 about Reid's back and its improvement in 2004 (the ALJ's fourth and fifth rationales for discrediting him), that early evidence paints only a partial picture and must be weighed along with Dr. Slack's later treatment notes.

There is one line of evidence that does impact Reid's credibility: the conflicting evidence about substance abuse. But while that might broadly impact Reid's credibility, it certainly does not undermine Reid's specific complaints about pain where there is medical evidence to support

---

[7] It is true that claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints" (SSR 96-7p). But an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide" (id.; cf. Moss v. Astrue, 555 F.3d 556, 562 (7th Cir. 2009) (per curiam)). Social Security Regulations explicitly acknowledge that an inability to afford treatment is one such explanation (SSR 96-7p).

those complaints. ALJs have special obligations as to a claimant's allegations of pain: In evaluating such allegations they must consider "all of the available evidence," including the claimant's medical history (SSR 96-7p).

Given the number of errors in the ALJ's analysis, a remand is the only logical remedy. Errors do not of course warrant remand if they are harmless -- that is, where "no reasonable trier of fact" would have concluded that the claimant was disabled (Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir.1996)). While the record may not be so clear that it "can yield but one supportable conclusion" in favor of disability (Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir.1993)), it cannot be said that no reasonable trier of fact would reach that conclusion.

One further point. It is important that on remand the ALJ should examine Reid's disability in two different time frames: the period from Reid's alleged disability onset date in 2003 to his last-insured-date in 2007 for Title II benefits, and the period from his application date to the present date for Title XVI benefits. Those two determinations may not be the same.

**Listing 1.04A**

Although the discussion to this point provides ample grounds for remand, this Court also encourages the ALJ on remand to consider and address whether Reid's impairments are sufficient to meet or medically equal those described in Listing 1.04A. While the claimant has the ultimate burden of proving that he meets each requirement within a relevant listing, an ALJ has an obligation, in reaching her listings-level conclusions, to "discuss the listing by name and offer more than a perfunctory analysis of the listing" (Barnett, 381 F.3d at 668).

In this instance there was no discussion of Listing 1.04A. While it is no more appropriate for the non-medically-trained author of this opinion to "play doctor" than for an ALJ to do so (an admonition often repeated by our Court of Appeals -- see, e.g., Moon v Colvin, 763 F.3d 718,

722 (7th Cir. 2014) and cases cited there), the literal language of Listing 1.04A and the evidence discussed in this opinion suggest the appropriateness of such scrutiny.

**Conclusion**

As stated at the outset of this opinion, both Rule 56 motions are denied. Reid's alternative prayer for relief -- a remand to Commissioner for renewed consideration -- is granted for the reasons that have been set forth at length by this Court.

_____
Milton I. Shadur
Senior United States District Judge

Date: June 22, 2015